UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
ENVISION HIGHLAND, LLC,

|  |  |
|---|---|
| Plaintiff, | Case No: 22-cv-5872 |
| -against- | **COMPLAINT** |

BANK OF AMERICA, N.A., WELLS FARGO BANK,
N.A., BERKADIA COMMERCIAL MORTGAGE, LLC,
RIALTO CAPITAL ADVISORS, LLC

Defendants.
-----------------------------------------------------------------------X

Plaintiff Envision Highland, LLC ("Envision"), by its attorneys, Tannenbaum Helpern Syracuse & Hirschtritt LLP, as and for its complaint against defendants Bank of America, N.A. Wells Fargo Bank, N.A. ("Wells Fargo"), Berkadia Commercial Mortgage, LLC ("Berkadia") and Rialto Capital Advisors, LLC ("Rialto") (collectively "Defendants"), hereby alleges as follows:

1.     This is an action for breach of contract, negligence and unjust enrichment following a campaign of predatory and improper conduct with regard to a commercial mortgage loan made to Envision regarding an office building it owned in Frederick, Maryland.  In what can only be described as an unadulterated cash grab, Defendants imposed requirements and charged Envision vague and undescribed fees entirely unsupported by the loan documents.  Further, the loan servicers acted to frustrate and impede the timely disposition of the mortgaged property through a mix of bad faith, incompetence and greed.  In total, Defendants unjustifiably and improperly deprived Envision of at least $478,408.42 in proceeds upon sale of its property while simultaneously forcing Envision to expend significant resources to exercise its fundamental rights under the loan documents.

**THE PARTIES**

2.     Plaintiff Envision is limited liability company duly organized and operating pursuant to the laws of the State of Maryland with its principal place of business, at all times relevant to this complaint, located at 550 Highland Street, Fredrick, Maryland.

3.     Upon information and belief, Bank of America, N.A. is a federally chartered bank with its principal office located at 100 North Tryon Street, Charlotte, North Carolina.

4.     Upon information and belief, defendant Wells Fargo is a federally chartered bank with its principal office located at 101 N. Phillips Avenue, Sioux Falls, South Dakota.

5.     Upon information and belief, defendant Berkadia is a limited liability company duly organized and operating pursuant to the laws of the State of Delaware with its principal office located at 521 Fifth Avenue, 16th Floor, New York, New York.

6.     Upon information and belief, defendant Rialto is a limited liability company duly organized and operating pursuant to the laws of the State of Delaware with its principal office located at 200 South Biscayne Boulevard, Suite 3550, Miami, Florida.

**JURISDICTION AND VENUE**

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1).

8.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 as the parties have agreed that the State and Federal Courts of the State of New York are the exclusive forum for disputes pursuant to the agreements relevant to the claims described herein and defendant Berkadia maintains its principal office in the Southern District of New York.

## **ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

9.      At all relevant times, Envision was the owner of a mixed use office and industrial property located at 550 Highland Street, Fredrick, Maryland 21701 (the "Property").

10.      On or about October 15, 2015, Envision, as borrower, and Bank of America, N.A., as lender, entered into a loan agreement (the "Loan Agreement") whereby Envision would borrow $12,000,000, evidenced by a promissory note, for the purchase of the Property (the "Loan").

11.      The Loan was ultimately securitized and transferred to the Wilmington Trust N.A., as Trustee for Morgan Stanley Bank of America Merrill Lynch, Commercial Mortgage Pass Through Certificates Series 2016-C29 (the "Trust").

12.      Section 13.2 of the Loan Agreement permits Bank of America, N.A. to delegate all or any portion of its loan responsibilities under the Loan Agreement or other loan documents to a servicer.

13.      Upon information and belief, the Trust engaged Wells Fargo to service the loan.

14.      Upon information and belief, Wells Fargo engaged Berkadia as the sub-servicer of the Loan.

15.      The Loan was secured by a deed of trust encumbering the Property and governed by the Loan Agreement and other loan documents executed along with the Loan Agreement (collectively, the "Loan Documents"), including a Cash Management Agreement, dated October 15, 2015, with Wells Fargo (the "CMA"), and a Deposit Account Control Agreement, dated October 15, 2015, with Wells Fargo (the "DACA").

16.      In sum and substance, following certain trigger events, the CMA and the DACA required that rents and gross revenue from the Property be paid into various trust and reserve

accounts for the purpose of perfecting the lender's security interest as well as funding capital improvements, taxes, insurance and other expenses relating to the operation of the Property.

17.     The CMA and the DACA were executed by Wells Fargo and Berkadia, as master servicer and sub-servicer respectively.

18.     Section 1(a) of the CMA requires that funds may disbursed from the Cash Management Account established under the CMA in accordance with the provisions of the Loan Agreement.

19.     Section 10.2(d) of the Loan Agreement requires that the money deposited pursuant to the CMA be held as additional security for the Loan and that such funds can be disbursed to make loan payments only in the event of a default.

20.     Section 10.2(a)(i) of the Loan Agreement requires that upon the commencement of a Cash Sweep Period, as defined in Section 1.1, that Envision must notify tenants to make rents payable to a deposit account managed by the terms of the DACA.

21.     Section 10.2(d) of the Loan Agreement requires that the money deposited pursuant to the DACA be held as additional security for the Loan and that such funds can be disbursed to make loan payments only in the event of a default.

22.     From the inception of the loan through January of 2021, Envision timely made all required payments of principal and interest on the Loan via automated banking transaction.

23.     On or about January 28, 2021, Berkadia notified Envision that it desired to change the bank maintaining the cash management and deposit accounts from Bank of America, N.A. to KeyBank, N.A.

24.     Berkadia also advised Envision that it was unilaterally terminating the CMA and the DACA and demanded that Envision sign new versions of the DACA and CMA designating the new bank.

25.     Envision requested that Berkadia make certain revisions and clarifications to the new DACA and new CMA, including, but not exclusive to, clarification on the terms and conditions for the return of the reserve funds to Envision and on the fees for which Envision would be charged.

26.     Section 13.4 of the Loan Agreement requires Envision to "cooperate with Lender in connection with any sale or transfer of the Loan," including the execution of amendments to the Loan Documents, but not if said changes would "(ii) modify or amend any other material economic term of the Loan or (iii) increase Borrower's obligations and liabilities or decrease Borrower's rights under the Loan Documents, other than to a de minimis extent."

27.     In direct derogation of Section 13.4 of the Loan Agreement, Berkadia refused to incorporate any of Envision's proposed corrections and clarifications, and instead, threatened to send the Loan to "special servicing" if Envision did not sign the agreements exactly as initially presented.

28.      Thereafter, Envision agreed to execute the new CMA and new DACA without revision and did so execute the new CMA and new DACA.

29.     At all relevant times Envision cooperated with the Defendants as required under the Loan Documents.

30.     Nevertheless, on or about June 24, 2021, Berkadia sent the loan to "special servicing" by defendant Rialto at Envision's cost and expense.

31.     Upon information and belief, a loan is sent to "special servicing" when the borrower is in default of its obligations under the governing loan documents.

32.     At the time the loan was sent to "special servicing" by Rialto, Envision was not in default of any of its loan obligations.

33.     At the time the loan was sent to "special servicing" by Rialto, neither Wells Fargo nor Berkadia had provided notice of default to Envision.

34.     When a loan is sent to "special servicing," the borrower is responsible for the servicing fees charged by the special servicer.

35.     In or about October 2021, Envision informed Berkadia that it had identified a buyer for the Property.

36.     In reply, Berkadia informed Envision that because the loan was in "special servicing," Envision would have to communicate through Rialto.

37.     Envision subsequently informed Rialto that it had procured a buyer for the Property, provided a copy of the contract of sale to Rialto, and requested a payoff letter from Rialto.

38.     Rialto refused to provide a payoff letter or account balance information and stopped crediting payments made by Envision for escrow and loan payments it had made.

39.     However, at no time in 2021 did any of the Defendants provide notice that Envision was in default of its obligations under the Loan Documents.

40.     Thereafter, on or about November 3, 2021, Rialto began insisting that Envision sign a "Pre-Negotiation Letter" as a precondition to discussing the sale of the Property and the defeasance of the Loan.

41.     Critically, the "Pre-Negotiation Letter" required Envision to waive the ability to present evidence of Rialto's misconduct and release Rialto from substantially all of its potential

liability for such misconduct. The Pre-Negotiation Letter also required Envision to waive basic and fundamental rights under the Loan Documents, including the right to be credited for loan payments made and the right to the return of property held by the lender.

42.     Envision had no obligation to sign the letter, and, accordingly, refused to sign the "Pre-Negotiation Letter."

43.     There is no requirement in the Loan Documents by which Envision can be compelled to sign a "Pre-Negotiation Letter" as a pre-condition to the sale of the Property and/or the defeasance of the Loan.

44.     Thereafter, Rialto refused to communicate with Envision without Envision providing the executed "Pre-Negotiation Letter."

45.     At the time the loan was sent to "special servicing," all required loan and payments were made by Envision by automated withdrawal from Envision's accounts.

46.     Starting in November of 2021, Defendants inexplicably and without notifying Envision, stopped accepting the automated payments required pursuant to the Loan Documents, and instead took the payments from reserve funds held by Defendants.

47.     After Envision became aware that Defendants stopped taking the payments, Envision asked for mortgage loan statements and payments instructions, but Defendants initially refused to provide such statements and payment instructions, only providing payment instructions months later

48.     At this time, weeks after Envision had executed the DACA and CMA, Rialto and Berkadia had not provided countersigned versions which indicated KeyBank, N.A.'s consent and agreement to hold Envision's reserve funds in compliance with the terms of the CMA and the DACA.

49.     Nevertheless, Envision made its required loan payments by check and wire to KeyBank, N.A. immediately upon receipt of payment instructions from Rialto.

50.     Though Defendants accepted the payments, they did not credit them to Envision's loan balance or reserve accounts.

51.     On or about February 14, 2022, Envision entered into a contract of sale for the Property.

52.     Pursuant to the contract of sale, Envision was required to close by May 5, 2022. The closing date was delayed and eventually took place on May 11, 2022.

53.     On or about February 23, 2022, Rialto, by counsel, mailed Envision notice that it was in default of its obligations under the terms of the Loan Documents.  Specifically, Rialto alleged that that the default was by virtue of "(i) Borrower's failure to comply with its obligations under the cash management provisions of the Loan Agreement and other of the Loan Documents, and (ii) Borrower's failure to pay the monthly payment due on January 1, 2022 and on all subsequent monthly payments dates."

54.     Envision had, in fact, made all required payments due pursuant to the terms of the Loan Documents, but Rialto had wrongly and improperly refused to credit those payments to Envision.

55.     In fact, Envision notified Rialto that the funds had not been automatically debited from Envision's account, that payments were made by alternate means, and that those payments had not been credited.

56.     Despite Envision sending proof of payment, Rialto continued to insist that payments had not been made and remained due and refused to accept evidence of payment or even acknowledge communications from Envision attempting to show that the payments were made.

57.     By declaring such default, Defendants claimed the right to collect an additional four percentage points of interest of pursuant to Section 2.4(b) of the Loan Agreement.

58.     Rialto also refused to provide mortgage statements to Envision to allow it to reconcile its books and determine how the missing funds were being accounted for.

59.     Thereafter, Envision continued to endeavor to sell the Property in compliance with the contract of sale, and, in turn, Rialto continued to impede and frustrate Envision's attempts by refusing to provide accurate account statements, charging excess interest and refusing or otherwise failing to provide a payoff letter.

60.     Despite numerous demands over the course of February and March of 2022, Rialto did not provide a payoff letter until April 6, 2022.

61.     Despite the obstacles interposed by Rialto and Berkadia, Envision was ultimately able to close the sale of the Property on May 11, 2022.

62.     After closing, Wells Fargo and Berkadia refused to timely return the funds being held in reserve following the closing in accordance with the requirements of the Loan Documents.

63.     The Loan Agreement, at Sections 9.1(c), 9.2(c), 9.3(c), and 9.4(b), requires all funds held in reserve to be disbursed to the Envision at the earlier of the full payment of the debt or the release of lien of the mortgage.

64.     The release of the lien of the mortgage occurred at the time of the closing on May 11, 2022.

65.     Defendants did not release the reserve funds until June 3, 2022, over three weeks after the contractually required date.

66.     When Envision did ultimately receive the reserve funds, it received a wire in the amount of $1,239,052.

67.     Defendants had unilaterally deducted and retained approximately $478,408.42 from the reserve funds.

68.     Upon information and belief, Wells Fargo and Berkadia failed to apply payments made by Envision to the loan balance and instead deducted amounts from the reserve funds to pay those loans.

69.     Wells Fargo and Berkadia also imposed over $80,000 of late charges and default interest despite the fact that Envision had made all necessary payments on a timely basis.

70.     Further, the ledgers for the loan balance and reserve accounts, disclosed only days before the on the sale of the Property, indicated hundreds of thousands of dollars in inexplicable reserve disbursements and "Misc. Amounts Payments" that have no apparent basis or justification.

71.     Defendants also imposed fees and costs for sending the Loan to "special servicing" despite the fact that Envision was always current on its obligations under the Loan Documents.

72.     Wells Fargo and Berkadia have refused to return the missing funds and excess and unsupportable charges despite due demand therefor.

## AS AND FOR A FIRST CAUSE OF ACTION
(Breach of Contract – Defendant Bank of America, N.A.)

73.     Envision repeats and realleges the allegations set forth in Paragraphs 1 through 72 above as if fully set forth herein.

74.     The Loan Agreement is a valid and binding contract as between Envision and Bank of America, N.A.

75.     Section 13.2 of the Loan Agreement allows the lender to delegate its responsibilities pursuant to the Loan Agreement.

76.     Upon information and belief, Bank of America, N.A. did delegate those responsibilities to Wells Fargo, Berkadia and Rialto.

77.     Wells Fargo and Berkadia, acting on behalf of Bank of America, N.A., caused Bank of America, N.A. to breach Section 10.2(d) of the Loan Agreement by using funds deposited pursuant to the CMA and the DACA to make Loan payments despite the fact that Envision had timely made all payments due under the Loan Agreement and provided proof of same.

78.     Wells Fargo and Berkadia, acting on behalf of Bank of America, N.A., caused Bank of America, N.A. to breach Section 13.4 of the Loan Agreement by improperly forcing Envision to sign a CMA and DACA which decreased Envision's rights under the Loan Documents.

79.     Wells Fargo and Berkadia, acting on behalf of Bank of America, N.A., caused Bank of America, N.A. to breach to Loan Agreement by declaring a default when no such default had, in fact occurred.

80.     This improper declaration of default permitted Bank of America, N.A. to collect a higher interest rate.

81.     Wells Fargo and Berkadia, acting on behalf of Bank of America, N.A., caused Bank of America, N.A. to breach Sections 9.1(c), 9.2(c), 9.3(c) and 9.4(b) of the Loan Agreement by failing to timely distribute reserve funds.

82.     Wells Fargo and Berkadia, acting on behalf of Bank of America, N.A., caused Bank of America, N.A. to breach the Loan Agreement by sending the Loan to special servicing by Rialto despite fact that no default had occurred.

83.     Wells Fargo and Berkadia, acting on behalf of Bank of America, N.A., caused Bank of America, N.A. to breach the Loan Agreement by charging numerous non-descript fees and allowing non-descript disbursements that had no basis or justification in the Loan Documents.

84.     As a result of these breaches of the Loan Agreement, Bank of America, N.A. is liable to Envision in an amount to be determined a trial, but not less than $478,408.42.

**AS AND FOR A SECOND CAUSE OF ACTION**
(Tortious Interference with Contract – Berkadia and Wells Fargo)

85.     Envision repeats and realleges the allegations set forth in Paragraphs 1 through 84 above as if fully set forth herein.

86.     The Loan Agreement is a valid and binding contract as between Envision and Bank of America, N.A.

87.     Wells Fargo and Berkadia tortiously and unjustifiably interfered with the Loan Agreement and caused Bank of America, N.A. to breach Section 10.2(d) of the Loan Agreement by using funds deposited pursuant to the CMA and the DACA to make Loan payments despite the fact that Envision had timely made all payments due under the Loan Agreement and provided proof of same.

88.     Wells Fargo and Berkadia tortiously and unjustifiably interfered with the Loan Agreement and caused Bank of America, N.A. to breach Section 13.4 of the Loan Agreement by improperly forcing Envision to sign a CMA and DACA which decreased Envision's rights under the Loan Documents.

89.     Wells Fargo and Berkadia tortiously and unjustifiably interfered with the Loan Agreement and caused Bank of America, N.A. to breach the Loan Agreement by declaring a default when no such default had, in fact, occurred.

90.     Wells Fargo and Berkadia tortiously and unjustifiably interfered with the Loan Agreement and caused Bank of America, N.A. to breach Sections 9.1(c), 9.2(c), 9.3(c) and 9.4(b) of the Loan Agreement by failing to timely distribute reserve funds.

91.     Wells Fargo and Berkadia tortiously and unjustifiably interfered with the Loan Agreement and caused Bank of America, N.A. to breach the Loan Agreement by sending the Loan to special servicing by Rialto despite fact that no default had occurred.

12

92.     Wells Fargo and Berkadia tortiously and unjustifiably interfered with the Loan Agreement and caused Bank of America, N.A. to breach the Loan Agreement by charging numerous non-descript fees and allowing non-descript disbursements that had no basis or justification in the Loan Documents.

93.     Wells Fargo and Berkadia employed improper and tortious means to procure these breaches including false declarations of default and bad faith refusal to negotiate a revised DACA and CMA.

94.     As a result of such tortious interference with contractual relations, Wells Fargo and Berkadia are jointly and severally liable to Envision in an amount to be determined a trial, but not less than $478,408.42.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Tortious Interference with Contract – Rialto)

95.     Envision repeats and realleges the allegations set forth in Paragraphs 1 through 94 above as if fully set forth herein.

96.     The Loan Agreement is a valid and binding contract as between Envision and Bank of America, N.A.

97.     Rialto tortiously and unjustifiably interfered with the Loan Agreement and caused Bank of America, N.A. to breach the Loan Agreement by declaring a default when no such default had occurred and Envision had made all required payments timely.

98.     Rialto tortiously and unjustifiably interfered with the Loan Agreement and caused Bank of America, N.A. to breach the Loan Agreement by refusing to timely provide monthly account statements or a payoff letter that would allow Envision to reconcile amounts properly due and owing under the Loan Agreement.

99.     Rialto tortiously and unjustifiably interfered with the Loan Agreement and caused Bank of America, N.A. to breach the Loan Agreement by charging numerous non-descript fees and allowing non-descript disbursements that had no basis or justification in the Loan Documents.

100.    Rialto employed improper and tortious means to procure these breaches including false declarations of default.

101.    As a result of such tortious interference with contractual relations, Rialto is liable to Envision in an amount to be determined a trial, but not less than $478,408.42.

### AS AND FOR A FOURTH CAUSE OF ACTION
(Negligence – Rialto)

102.    Envision repeats and realleges the allegations set forth in Paragraphs 1 through 101 above as if fully set forth herein.

103.    As a special servicer of a mortgage, Rialto owed to Envision, as borrower, a duty of care to ensure that fees were properly and accurately imposed, payments were accurately accounted for, and that statements were accurate and timely provided so that Envision could comply with obligations under the Loan Documents.

104.    Rialto breached its duty of care by failing to properly credit and account for payments made by Envision, failing to timely provide account statements and a payoff letter and imposing excessive and unjustified fees.

105.    As a result of such negligence, Rialto is liable to Envision in an amount to be determined a trial, but not less than $478,408.42.

### AS AND FOR A FIFTH CAUSE OF ACTION
(Negligence – Berkadia and Wells Fargo)

106.    Envision repeats and realleges the allegations set forth in Paragraphs 1 through 105 above as if fully set forth herein.

14

107.    As a servicer and sub-servicer of a mortgage, Wells Fargo and Berkadia owed to Envision, as borrower, a duty of care to ensure that fees were properly and accurately imposed, payments were accurately accounted for, and that statements were accurate and timely provided so that Envision could comply with obligations under the Loan Documents.

108.    Wells Fargo and Berkadia breached its duty of care by failing to properly credit and account for payments made by Envision, failing to timely provide account statements and a payoff letter and imposing excessive and unjustified fees.

109.    As a result of such negligence, Wells Fargo and Berkardia are jointly and severally liable to Envision in an amount to be determined a trial, but not less than $478,408.42.

WHEREFORE, plaintiff Envision Highland, LLC respectfully requests that this Court enter judgment:

(a)    on Envision's first cause of action, in favor of Envision and against defendant Bank of America, N.A. in an amount to be determined at trial but not less than $478,408.42;

(b)    on Envision's second cause of action, in favor of Envision and against defendants Wells Fargo and Berkadia, jointly and severally, in an amount to be determined at trial but not less than $478,408.42;

(c)    on Envision's third cause of action, in favor of Envision and against defendant Rialto, in an amount to be determined at trial but not less than $478,408.42;

(d)    on Envision's fourth cause of action, in favor of Envision and against defendant Rialto, in an amount to be determined at trial but not less than $478,408.42;

(e)    on Envision's fifth cause of action, in favor of Envision and against defendants Wells Fargo and Berkadia, jointly and severally, in an amount to be determined at trial but not less than $478,408.42; and

(f)    granting to Envision such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        July 5, 2022

                                TANNENBAUM HELPERN
                                SYRACUSE & HIRSCHTRITT LLP


                                By: *Adam M. Felsenstein*
                                     Adam M. Felsenstein
                                900 Third Avenue
                                New York, New York 10022
                                (212) 508-6700
                                felsenstein@thsh.com

16